# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Wayne R. Andersen | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 3943 | **DATE** | 6/19/2003 |
| **CASE TITLE** | U.S.A. ex rel Reginald Perry vs. James Page | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **Enter MEMORANDUM, OPINION AND ORDER: For the foregoing reasons, we deny [1-1] the Section 2254 petition for a writ of habeas corpus brought by Petitioner Reginald Perry. This is a final and appealable order. This case is terminated.**

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required. | | | number of notices | |
| | Notices mailed by judge's staff. | | | | |
| | Notified counsel by telephone. | | | JUN 20 2003 | |
| ✓ | Docketing to mail notices. | | | date docketed | 20 |
| ✓ | Mail AO 450 form. | | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | date mailed notice | |
| TSA | courtroom deputy's initials | | U.S. DISTRICT COURT CLERK 03 JUN 20 AM 8: 24 | date/time received in central Clerk's Office | mailing deputy initials |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED

JUN 2 0 2003

| | | |
|---|---|---|
| United States of America ex rel.<br>REGINALD PERRY,<br><br>Petitioner,<br><br>v.<br><br>JAMES PAGE, Warden,<br>Stateville Correctional Center,<br><br>Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 00 C 3943<br><br>Wayne R. Andersen<br>District Judge |

## MEMORANDUM, OPINION AND ORDER

This case is before the Court on the petition of Petitioner Reginald Perry for a writ of

habeas corpus pursuant to 28 U.S.C. § 2254. For the following reasons, we deny the petition for

habeas corpus.

## BACKGROUND

Petitioner Reginald Perry does not challenge the statement of facts set forth in the order

of the Illinois Appellate Court affirming his convictions for first degree murder and armed

robbery. *People v. Perry*, No. 1-87-0463, Illinois Appellate Court, First District, February 28,

1992. For purposes of federal habeas review, "a determination of a factual issue made by a *State*

court shall be presumed to be correct." 28 U.S.C. § 2254(e). Accordingly, we will adopt the

facts as our own.

Petitioner was found guilty in a bench trial by Judge Joseph Kazmierski, Jr. of armed

robbery and murder. He was sentenced to consecutive terms of 50 years for the murder and 30

years for the armed robbery. Petitioner appealed his conviction and sentence to the Illinois

Appellate Court, First District, arguing the following issues: (1) whether the prosecutor's failure to tender grand jury transcripts of witnesses against Petitioner in response to discovery request prior to trial deprived Petitioner of a fair trial; (2) whether Petitioner was proven guilty beyond a reasonable doubt of the crimes charged; and (3) whether the imposition of consecutive sentences was excessive under the facts and circumstances of this case.

At trial, Natalie Leon Lasko, older sister to the victim, Ivan Leon, testified that her brother came from Colombia to Chicago to live with her on October 14, 1984. She testified that her brother later moved to an apartment at 5400 N. Sheridan in Chicago and took a night janitor's job at the Sears Tower. She testified that in the early morning hours of August 8, 1985 she received a call from her doorman who told her the police needed to speak with her at a nearby building. She spoke to police there and told them her brother also used the name of Julian Ciera. She testified that she went to the hospital where her brother had been taken and learned that her brother had died.

Kathleen Frazier, who lived on the sixth floor of an apartment building on Sheridan Road in Chicago, testified that she heard someone shout two times, "Give me your wallet," at approximately 2 a.m. on August 8, 1985. She testified that she went to the window and looked down to the intersection of Sheridan and Balmoral in Chicago. A tree partially obstructed her view but she testified she could see shadows, "as if there was a fracas going on." She testified that she saw the victim fall to the ground, face up, and saw that his shirt was covered with blood. She testified that she saw the back of someone as he ran down Balmoral. She testified that the man running was a lighter hue black man or perhaps a lighter hue Hispanic man. He wore dark

colored pants and no shirt. She testified that he was a younger man with a slim, muscular build and dark hair cut close to his head. She testified that she phoned 911.

On cross-examination, Frazier testified that she was having trouble sleeping and, therefore, was awake when she heard someone shout. She testified that she could not see what occurred on the ground below because a tree blocked her view. She stated that she could see the victim's upper torso when he fell to the ground. She did not see the person on Balmoral running away from the victim, she just saw him on Balmoral, running. She could not identify Petitioner as the assailant.

Allen Lucas, a Chicago Police officer, testified that he found the victim at the scene with several stab wounds to his chest and his pockets turned inside out. He inventoried several items found at the scene including men's glasses, a pen, a comb case and a man's wallet found near a mailbox. He testified that he interviewed Frazier who told him that she was awakened by man yelling "Give me your wallet. Hurry up, give me your wallet." She looked out her window and saw a light-skinned black male with no shirt and dark pants. He testified that she believed a scuffle occurred, one man fell and the black man fled westbound on Balmoral. On cross-examination, Lucas testified that another officer interviewed someone else at the scene who indicated that a second offender might have been involved and was seen running northbound on Sheridan Road.

Ralph Archulita, a Chicago Police sergeant, testified that he found two pieces of identification at the scene, one to Ivan Leon and another to Julian Ciera. Kimberly Rice, an acquaintance of the Petitioner, testified that at about 2:30 a.m. on August 8, 1985 Petitioner threw some rocks at her window at 5420 N. Sheridan Road and asked to be let in. She said she

3

asked him what had happened because from the window she saw that he had a knife in his hand, a gash on his wrist and a little blood on him. She testified that the Petitioner had on no shirt, black pants and a pair of black boots. She testified: "He told me he had got into a fight with someone, and then and a guy had got to struggling, and he robbed the guy. He thought he killed him." She testified that she opened a beer for Petitioner. She gave him a wet towel to wipe away the blood and then threw the towel in her closet. Later, a police detective, Stone, took the towel from the closet. She identified the towel in court. She testified that when she buzzed Petitioner in and he came up to her apartment, he no longer had the knife in his hand but had a brown-handled knife with a six-inch blade in his back pocket. She testified that he was intoxicated. She told him to calm down and dialed the phone for him because he said he needed to talk to a friend, Chuck Wade. She testified that Wade's girlfriend answered the phone and said Wade was not there. She testified that she then went to the store to buy more beer, but stopped first to talk to police officers across the street who asked her how long she had been outside. She testified that while she was out there a police officer found a wallet near a mailbox. She testified that she paid for the beer with a blood-stained $10 bill Petitioner had given her and then returned home where Petitioner explained what had happened.

Ms. Rice testified that Petitioner had injured his eye in a fight and told her he "just went off and stabbed" the victim when the victim hit him in the eye. She testified that she gave him some clothes and walked with him for a few blocks before they parted company. She saw him the next day after she ran into his girlfriend, and they found Petitioner at a friend's apartment. She testified that he was drunk but that they dressed him and took him to the house of another friend, Rick Wade, where they cut Petitioner's hair and tried to remove a tattoo from his chest

4

with bleach, alcohol and lemon juice. She testified that Petitioner was crying and told her he needed to stop drinking and was going to get help. On cross-examination, she testified that when she spoke to him from the window he was hysterical but when he was in her apartment he only was drunk. After refreshing her recollection with grand jury testimony, she then testified that he was hysterical and crying in her apartment. She testified that she remembered giving grand jury testimony that Petitioner's hair was long but she did not remember telling the grand jury that he had an Afro.

Ms. Rice testified on cross-examination that a cut was on Petitioner's left wrist. She testified that when she returned from the liquor store, Petitioner made three phone calls. He told her he was sorry and said he hoped he had not killed the guy. She testified that during this second conversation she could not recall whether he mentioned that he robbed the guy. When asked whether she told the grand jury that Petitioner never mentioned robbery during their second conversation, she testified that she had no recall of that. Rice testified that she threw Petitioner's boots away because one of the heels was broken. She testified that she never went to the police because she was scared. On redirect examination she repeated a statement she had made to the grand jury-- that Petitioner told her he had a fight with someone, robbed him, stabbed him and thought he had killed him.

Pamela Fish, a Chicago Police Department crime lab expert, testified that the blood type and blood enzymes on the towel found at Rice's apartment and in some of Ivan Leon's blood were identical. On cross-examination, Ms. Fish acknowledged that she was never given a sample of Petitioner's blood to analyze.

Cheryl Williams, a girlfriend of Ricky Wade, testified that Rice, Petitioner and the Petitioner's girlfriend stopped at her home on August 8, 1985 in the late afternoon or early evening. She testified that Petitioner told her he had robbed a man in the 5400 block of North Sheridan and that the man hit him in the eye while he was attempting to rob him. She testified that Petitioner told her he pulled out his own knife and stabbed the victim from 12 to 14 times. She testified that Petitioner told her he stole a $10 and $5 bill from the victim's wallet and threw the wallet under the mailbox across the street and then went to Rice's house.

Ms. Williams testified that before August 8, 1985, she had cleaned up a cut on Petitioner's arm that he suffered in a burglary at a shoe store. She acknowledged that she was currently on probation for juvenile pimping and solicitation. On cross-examination, she denied that she was ever told she could be prosecuted as an accessory to the murder.

Rick Wade, also known as Harold Wade, testified that Petitioner came to his house on August 8 and told him he robbed $15 from a guy. He testified that Petitioner told him he did not know if the guy was dead and that he had given Rice $10 to buy alcohol. He testified that he had seen Petitioner the night before dressed in black pants and no shirt. He acknowledged that he had an attempted burglary conviction on his record and a pandering conviction, for which he was sentenced to two years.

On cross-examination, Wade denied being told that he could be prosecuted as an accessory to the crime. He testified that Petitioner never told him it was his intention to rob the victim from the very beginning but he understood that the incident had started as a fight. Wade testified that the first thing Petitioner told him was that he robbed the guy. He testified that he told Petitioner he had to leave because "it was obvious he had hurt somebody, he had killed

6

somebody." Wade testified that after Petitioner read in the newspaper that the victim had died, he told Wade he did not mean to kill anybody.

The parties stipulated that the victim died of multiple stab wounds, and the State rested its case. The defense then called witnesses in Petitioner's defense.

Charles Wade testified that he saw Petitioner briefly at his Franklin Park home on August 9, and Petitioner said the cuts on his arm were the result of a fight he had with someone. Wade's fiancee, Vivian Emrick, testified that she saw cuts on Petitioner's right and left arms.

Michael Federichi, a delivery person for the Wall Street Journal and part-time taxi driver, testified that he delivered papers to 5415 N. Sheridan Road at about 2:00 or 2:15 a.m. on August 8. He testified that as he left the building and pulled away in his car, he saw two people standing next to each other at a sheltered bus stop on Sheridan near Balmoral. One man was wearing a dirty, white, long-sleeved shirt and dark brown or black pants. He testified that he believed they were both either Caucasian or Hispanic but did not believe they were black.

Federichi testified that the two persons crossed the street and then he saw them about 25 or 30 feet away "horsing around." Soon he saw one on the ground kicking at the other who was still standing. He testified that the man standing had a shirt on. He testified that he had his window down and heard nothing. Petitioner was told to stand in the courtroom and Federichi testified that Petitioner did not look like the person he saw standing over the other man because Petitioner was thinner. On cross-examination, Federichi testified that he did not get a very good look at either person. On redirect examination, he testified that he returned to the area 15 minutes later and discovered police there and a maintenance man cleaning blood off the sidewalk where he had seen the two people.

7

Teresa Suzy Mendoza, Petitioner's girlfriend, testified that she received a phone call from Petitioner at approximately 2:00 or 2:30 a.m. on August 8, 1985. She testified that it was Kim Rice's idea to buy Petitioner new shoes, get him some clothes, bandage his wounds and cut his hair. She testified that until that time, Petitioner had an Afro hair style.

Ms. Mendoza testified that Rice had the motivation to lie about Petitioner because Petitioner was preventing Mendoza from working as a prostitute for Rice, which Rice wanted. Mendoza testified that she never worked for Rice as a prostitute. When asked why Rice might be motivated to lie about Petitioner, she testified that Rice was worried she would have to go to jail for helping Petitioner.

Petitioner testified that on the night of the incident, he was drinking with friends for an hour or two and then intended to walk to another friend's house on Bryn Mawr. He testified that when he reached Balmoral and Sheridan he saw a man at the bus stop and they literally bumped into each other. He testified that the man asked him, "What you be," which he interpreted to mean an inquiry about the street gang tattoo on Petitioner's chest. Petitioner testified that he received the tattoo six years ago when he was 12, and he denied gang membership at the time of trial.

Petitioner testified that he told the man to leave him alone but the man swung at him twice, hitting him once in the eye and once in the jaw. He testified that he stumbled back but then stepped forward and then pushed the man in the chest. He testified that he asked the man if he was crazy and swore at him, but the man just swore back at him. He testified that he then started walking east on Sheridan Road but that the man followed two or three feet behind, eventually pushing Petitioner from behind. Petitioner testified that he turned around and pushed back, and

8

the man took a swing at him. He testified that he fell to the ground and was lying on his back when he saw the man pull out a knife. He tried to kick the knife from the man's hand but the man dove on top of him with the knife and cut him three times, once on the hand and twice on the forearm.

Petitioner testified that the two wrestled with the knife, and he obtained control of it and began hitting the man with the knife. After about a minute, he stopped. He testified that he managed to get up, and he ran down Sheridan Road to his friend, Kim Rice's house. He testified that he was crying and bleeding. He rang her doorbell, and she let him in and gave him a beer.

He testified that he went to the bathroom to wipe his wounds with a towel and then came back and told Rice he had been in a fight and a guy had tried to kill him. Petitioner testified that shortly after that, Rice left the apartment without explanation and returned three or four minutes later with a wallet in her hand and said she had found it. Petitioner testified: "I told her that the wallet might belong to the person I had the fight with and I told her her fingerprints would be on the wallet and she should get rid of it." He testified that she left again, returning five minutes later without the wallet and with a six-pack of beer. He testified that he phoned his girlfriend while he was there.

Petitioner denied ever giving Rice money or telling her that he had robbed someone. He testified that it was never his intention to rob or fight with the man and that he only took the knife away from the man and never turned the man's pockets inside out. Petitioner testified that Rice had the motivation to lie about their encounter because Rice had wanted Petitioner's girlfriend to work as a prostitute for Rice and Rick Wade's prostitution ring but that Petitioner had refused to allow it. Petitioner testified that he was at Rice's apartment for about 25 or 30 minutes and then

9

the two left together, although he proceeded alone to his friend Keith Allen's house on Bryn Mawr. He testified that he stayed at Allen's house overnight and was awakened the next day around noon by Rice who was slapping him in the face. He testified that Rice told him the police were looking for him, and she told him she was going to cut his hair.

Petitioner testified that he went to Rick Wade's house with his girlfriend and Rice, but he denied telling Wade or Wade's girlfriend, Cheryl Williams, that he had robbed, stabbed and killed a guy. He admitted that when Rice brought in the newspaper about the person being killed, he told the people at Wade's house that "I hope that I didn't kill the person." He denied telling Rick Wade or Cheryl Williams that he had tried to rob the man. He speculated that Wade was motivated to lie about him because the Petitioner would not permit his girlfriend to work for Wade.

Petitioner denied ever carrying a knife with him and denied showing up at the Wade home a week before the incident with cuts on his arm. Petitioner testified that he did not know the man he had the altercation with on August 8, 1985 and had no intention of robbing him. He testified that he stabbed the man because he feared for his life. Petitioner stated: "I thought he was going to kill me."

On cross-examination, Petitioner acknowledged that after drinking with friends, he walked from Irving and Sheridan (at 4000 N. Sheridan) to 5400 N. Sheridan. He testified that the victim, shown to him in a photograph, is the person he scuffled with that night. He testified that although the man hit him in the eye, that did not make him mad and did not prompt him to start stabbing the man. He testified that the entire time he was stabbing the victim, the victim was hitting him and he was afraid of the victim. Petitioner testified: "I was protecting myself-- I

10

thought that he was trying to kill me." He testified that he feared for his life the entire time he stabbed the victim even though the wounds included four stabs to the back and about six stabs in the chest.

Petitioner testified that when he arrived at Rice's house, he did not use the big white towel displayed in court but rather used a small face cloth to wipe up the blood on his body. He testified that he "had an idea" Rice got the wallet off of the person he had a fight with, but he denied ever seeing the man's wallet. He acknowledged that the police were at the scene of his altercation with the man when he and Rice left her apartment. He admitted that he changed into new pants and shoes the next day because he was concerned that the police would find out what he was wearing the night before. He testified that Rice cut his hair because she wanted to disguise him but he stated, "I wasn't trying to disguise myself."

Petitioner testified that he told Rick Wade he had gotten into a fight the night before, but he denied telling Wade he had stabbed the man. He acknowledged that he read the newspaper article about the stabbing but denied telling his friends anything more than that he had gotten into a fight. He testified that the man he met on the street that night spoke English to him, not Spanish.

On redirect examination, Petitioner testified that he never called police because he was afraid the police would not believe his story.

The record indicates that while Petitioner was putting on his evidence, Petitioner filed a motion to dismiss the charges against him or, in the alternative, for a mistrial. The motion stated that on November 21, 1986, Petitioner learned that Rick Wade and Cheryl Williams testified before a grand jury with regard to the death of Gladys Powell, allegedly at the hand of Prentice

11

Jackson. Petitioner's case is unrelated to the Jackson case. The defense motion asked the court to order the State to produce the grand jury transcript. The State noted that the transcript was produced when identified and requested.

Dr. An, an expert in forensic pathology, testified for the defense and stated that he conducted the autopsy on the victim, Ivan Leon. He testified that some of the victim's wounds on the hand and the forearms were suggestive of a struggle. He characterized the wounds on the hand as "defensive wounds" or wounds sustained while someone was trying to defend themselves. He testified that it would have been unlikely that the victim could have continued to struggle after receiving the fatal wounds to the chest but there was no way to tell which wounds occurred first. He testified that the body had 14 stab wounds and ten "cutting" wounds. He testified that there were three abrasions on the body, on the left forehead, the left hip and the left ankle.

The defense then rested with the exception of "perhaps" bringing in Rick Wade to testify under subpoena. The court continued the case for approximately two weeks and then permitted Petitioner to reopen his cross-examination of Harry "Rick" Wade, who had testified in the State's case in chief. The court stated that it would allow the defense to re-open its cross examination of Wade only for the purpose of asking about Wade's grand jury testimony in the unrelated Jackson case.

Under recross-examination, Wade acknowledged that he testified before a grand jury in September 1985 about a shooting that occurred in his building August 17, 1985 between Gladys Powell and Prentice Jackson. He testified that he went to the police willingly a few days after Powell was shot but he never told the police about Petitioner. Wade admitted that he told the

12

grand jury investigating the Powell murder that he was freebasing cocaine four or five times a day from July 1985 to August 8, 1985, the date of Leon's murder. He denied that the cocaine use would have affected his ability to perceive things around him. Defense counsel attempted to question Wade about his drug arrest on March 18, 1985 and a pandering arrest on June 1, 1985. The court noted that the arrests were raised by the State in its case in chief and, therefore, the defense had ample opportunity to cross examine Wade about these charges when it cross examined Wade the first time. The court, however, then permitted defense counsel to continue his questions with regard to Wade's prior arrests.

Wade admitted that he was arrested on the drug and pandering charges and that the State dropped the drug charge on October 1, 1985. He pleaded guilty on June 1, 1986 to the pandering charge and was sentenced to two years but was released on October 1, 1986. Wade admitted that the State did help him on the drug case by having it dismissed in exchange for help on the unrelated Prentice Jackson case.

A stipulation was entered into the record that if Detective Fred Stone were to testify, he would state that neither Rice, Wade nor Cheryl William came to him and volunteered information about Petitioner's involvement in the crime. A stipulation was entered that if Detective Sikorski were called to testify, he would testify that the victim's sister told him the victim had a drinking problem, was depressed and had threatened suicide.

After closing arguments, the trial judge found Petitioner guilty of armed robbery and of the murder committed during the armed robbery. At the sentencing hearing, the trial judge found as a matter of law that imposition of the death penalty was improper. In imposing sentence the trial judge stated:

"Mr. Perry, I have reviewed the presentence report, the circumstances of the offense that you have been found guilty of, and, of course, I am considering your potential for rehabilitation as the law requires me to. Even if it did not, I would consider it because I think it is the proper thing to do. At the time of this offense you were just three months into your 18th year, or I should say your 19th year. With the grace of God if you had committed this offense four months earlier, you could not even be considered eligible for the death sentence. However, you were eighteen years of age and you were a young man and you probably had more experience on the street than the average young man your age because of circumstances that you have no control over, circumstances that effected [sic] your life. So I feel a certain amount of sympathy for you. However, that sympathy does not mitigate against the impact that your act has on the entire community. It is not only rehabilitation that must be considered but the extent to which you represent a danger to the community must be considered as well. We all come into this world with potential to do unspeakable harm and limitless good. What separates many of us is what we do with that capacity. Some people demonstrate the capacity to do harm and some don't, although we all share. In your case, you made that demonstration. You have gone out and killed another human being in a very cruel fashion. I think the community would be shocked if a minimal sentence were imposed."

The trial judge then sentenced Petitioner to the extended term of 50 years on the murder conviction and 30 years on the armed robbery, the sentences to run consecutively. Petitioner moved for a new trial, alleging that: (1) he should have been given immunity from the charges because he was offered immunity for testifying in another case; and (2) he was denied a fair trial because the State failed to turn over grand jury testimony regarding Rick Wade and Cheryl Williams until the middle of the defense's case. The trial court denied Petitioner's motion for a new trial.

## PROCEDURAL HISTORY

Petitioner appealed his conviction and sentence to the Illinois Appellate Court raising the following issues: 1) the prosecution's failure to tender grand jury transcripts of witnesses against

Petitioner in response to discovery requests prior to trial deprived Petitioner of a fair trial; 2) Petitioner was not proven guilty beyond a reasonable doubt; and 3) the imposition of consecutive sentences was excessive. On February 28, 1992, the Illinois Appellate Court affirmed petitioner's conviction and sentence, but reversed the trial court's order that the sentences be served consecutively and ordered that the sentences be served concurrently. Petitioner did not file a petition for leave to appeal to the Illinois Supreme Court.

On April 22, 1994, Petitioner filed a pro se petition for post-conviction relief pursuant to the Illinois Post-Conviction Hearing Act, 725 ILCS 5/122-1, et seq. On March 10, 1996, Petitioner, through counsel, filed an amended petition for post-conviction relief raising the following issues: 1) Petitioner was denied effective assistance of trial counsel because counsel failed to elicit the impact Petitioner's family background had on Petitioner's behavior; 2) Petitioner was denied effective assistance of trial counsel because counsel did not discuss with Petitioner whether he wanted to withdraw his jury waiver; 3) Petitioner was denied effective assistance of trial counsel because counsel did not have Petitioner evaluated to determine whether he was insane; 4) Petitioner was denied effective assistance of trial counsel because counsel did not present expert witnesses and supporting articles to demonstrate how Petitioner's childhood diminished his ability to act as a sensible citizen; 5) Petitioner was denied his right to make a knowing and intelligent jury waiver; and 6) appellate counsel was ineffective for failing to raise on direct appeal the issue that Petitioner was denied his right to make a knowing and intelligent jury waiver.

The trial judge dismissed Petitioner's post-conviction petition on August 28, 1997. Petitioner then appealed the denial of his post-conviction petition to the Illinois Appellate Court

for the First District raising the following issues: 1) ineffective assistance of trial counsel because counsel failed to elicit evidence about Petitioner's family background at the sentencing hearing; 2) due process and equal protection violations occurred when the post-conviction court refused to appoint a psychiatrist to aid Petitioner's claim that trial counsel was ineffective; 3) Petitioner was denied his right to a jury because he never knowingly and intelligently waived his right to a jury; 4) ineffective assistance of appellate counsel because counsel failed to raise the issue that Petitioner was denied his right to make a knowing and intelligent jury waiver; and 5) the Circuit Court erred when it dismissed the post-conviction petition without an evidentiary hearing. On December 17, 1999, the Illinois Appellate Court affirmed the denial of Petitioner's post-conviction petition.

Petitioner then filed a petition for leave to appeal the denial of his post-conviction petition to the Illinois Supreme Court, raising the following issues: 1) Petitioner's rights to due process and equal protection were violated when the post-conviction court refused to appoint a psychiatrist to assist Petitioner in presenting evidence; and 2) ineffective assistance of trial counsel because counsel failed to elaborate on the impact of Petitioner's family background on his behavior. On April 5, 2000, the Illinois Supreme Court denied the petition for leave to appeal.

Petitioner then filed the instant petition for a writ of habeas corpus in this Court. In his petition, he raises two grounds for relief: 1) Petitioner's rights to due process and equal protection were violated when the post-conviction court refused to appoint a psychiatrist to assist Petitioner in presenting evidence in support of his post-conviction petition; and 2) Petitioner was

denied effective assistance of trial counsel when counsel failed to elaborate on Petitioner's family background.

## DISCUSSION

Federal courts may issue a writ of habeas corpus if a petitioner demonstrates that he is "in [state] custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2245(a); Moffat v. Gilmore, 113 F.3d 698, 702 (7th Cir. 1997); see also Del Vecchio v. Illinois Dept. of Corrections, 31 F.3d 1363, 1370 (7th Cir. 1994) (en banc) ("[F]ederal courts can grant habeas relief only when there is a violation of federal statutory or constitutional law.") The federal courts may not grant habeas relief under Section 2254 unless the state court's judgment "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Before a federal court may review the merits of a habeas petition, a petitioner must: (1) exhaust all remedies available in state courts; and (2) fairly present any federal claims in state court first, or risk procedural default. See Chambers v. McCaughtry, 264 F.3d 732, 737 (7th Cir. 2001) ("Failure to exhaust available state court remedies constitutes a procedural default"); see also Bocian v. Godinez, 101 F.3d 465, 468 (7th Cir. 1996) (same). "The habeas petitioner must present his federal constitutional claims initially to the state courts in order to give the state 'the opportunity to pass upon and correct alleged violations of its prisoners' federal rights.'" McGowan v. Miller, 109 F.3d 1168, 1172 (7th Cir. 1997) (quoting Duncan v. Henry, 513 U.S. 364, 365 (1995)).

A petitioner has exhausted his state court remedies "by either (a) providing the highest court in the state a fair opportunity to consider the constitutional issue, or (b) having no further available means for pursuing a review of one's conviction in state court." Wallace v. Duckworth, 778 F.2d 1215, 1219 (7th Cir. 1985).

In this case, exhaustion is not an issue. Respondent concedes that Petitioner has exhausted his state court remedies for purposes of federal habeas review because he has no further avenues in state court through which to challenge his conviction and sentence . We now turn to the issues before us.

## I. Ineffective Assistance Of Counsel

Petitioner first argues that he was denied effective assistance of trial counsel because counsel failed to elaborate on the impact Petitioner's family background had on his behavior. Specifically, Petitioner argues that trial counsel rendered ineffective assistance by failing to emphasize certain mitigating factors, namely, that Petitioner witnessed his mother kill his stepfather in self-defense when he was five years old and that he spent 10 years as a ward of the State. Petitioner claims that counsel should have presented expert testimony at sentencing to support the mitigating effect on Petitioner's development and life. Petitioner also alleges that the Illinois Appellate Court applied the wrong standard, contrary to the requirements of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2054 (1984), when the Appellate Court found that there was no prejudice. Before we can address the merits of this claim, we must first address whether this claim is procedurally defaulted.

## A. Procedural Default

The procedural default hurdle forbids the federal courts from addressing claims that were not fairly presented to the state court. Jones v. Washington, 15 F.3d 671, 675 (7th Cir. 1994). Procedural default occurs either when a state court has declined to address a federal claim because the petitioner failed to satisfy an independent state procedural requirement, Coleman v. Thompson, 501 U.S. 722, 729-30 (1991), or when the petitioner fails to present a claim to the state courts at the time, and in the way, required by the state. Hogan v. McBride, 74 F.3d 144, 146 (7th Cir. 1996).

Respondent asserts that this ineffective assistance of counsel claim is barred from consideration by this Court under the rules of procedural default because it was rejected on adequate and independent state law grounds by the highest state court to review it. See Coleman v. Thompson, 501 U.S. 722, 750, 111 S.Ct. 2546, 2565 (1991). Procedural default can be invoked when the state court actually relied on a state procedural rule as an independent basis for its decision. Harris v. Reed, 489 U.S. 255, 263 (1989). To determine whether a state court independently and adequately relied on a state procedural rule, the federal court looks to the highest state court that has supplied an explanation. Prihoda v. McCaughtry, 910 F.2d 1379, 1383 (7th Cir. 1990). As a matter of comity, the federal courts generally will be bound by a state's finding of a procedural default under its own laws. White v. Peters, 990 F.3d 338, 340 (7th Cir. 1993).

In this case, the Illinois Appellate Court found that the trial court was aware of Petitioner's background and, therefore, the issue of ineffective assistance of trial counsel for failing to elaborate on the impact Petitioner's family background had on his behavior was barred

under the doctrine of res judicata. Exhibit H at 10. The Appellate Court found that the trial court took Petitioner's family background into consideration in reducing his sentence. Id.; citing People v. Perry, 226 Ill.App.3d 326, 344 589 N.E.2d 776, 794 (1st Dist. 1992). The Appellate Court went on to find that Petitioner's ineffective assistance of counsel claim based on counsel's failure to call an expert witness regarding the impact of Petitioner's family background could have been raised on direct appeal and, therefore, was waived. Exhibit H at 10. Thus, Petitioner's claim of ineffective assistance of counsel was dismissed based upon independent and adequate state law grounds by the highest state court to give an opinion given its finding of res judicata and waiver. It is not our place to contradict these types of determinations. Therefore, this claim is procedurally defaulted and is barred from federal habeas review.

A federal court may nonetheless address the merits of a procedurally defaulted claim if the petitioner can establish cause and prejudice that would excuse it or, alternatively, establish that he fits within the miscarriage of justice exception to the cause and prejudice rule. Coleman, 501 U.S. at 750-51; Wainwright v. Sykes, 433 U.S. 72, 84-85 (1977). The Supreme Court has interpreted "cause" under this test to be something external to the petitioner which is both beyond his control and which cannot be fairly attributed to him. Murray v. Carrier, 477 U.S. 478, 488 (1986). In order to establish prejudice, the petitioner "must show not merely that the errors . . . created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire . . . [sentencing] with error of constitutional dimensions." Id. at 494.

In this case, Petitioner has failed to establish cause and prejudice. He has not shown that any external event which was beyond his control occurred, nor has he shown that the alleged error of trial counsel failing to elaborate on the impact Petitioner's family background had on his

20

behavior actually worked to his actual and substantial disadvantage, so infecting his sentencing with error of constitutional dimensions.

Although Petitioner has failed to establish cause and prejudice, he can still overcome this forfeiture by showing that he fits within the "miscarriage of justice" exception. This exception is limited to those extraordinary cases in which the petitioner is actually innocent of the crime for which he is imprisoned. <u>Bell v. Pierson</u>, 267 F.3d 544, 551 (7th Cir. 2001). Therefore, it requires a colorable claim of actual innocence, as opposed to legal innocence, coupled with an allegation of a constitutional claim. <u>See</u> <u>Sawyer v. Whitley</u>, 505 U.S. 333, 339-40 (1992). The miscarriage of justice exception applies only if the petitioner can demonstrate that it is more likely than not that no reasonable jury would have convicted him, or given him the sentence that he received, in the absence of the alleged defect in the state court proceedings. <u>See</u> <u>Schlup v. Delo</u>, 513 U.S. 298 (1995). In this case, Petitioner makes no attempt to show that a fundamental miscarriage of justice has occurred. There is no colorable claim of actual innocence before us.

Accordingly, Petitioner's claim of ineffective assistance of counsel is barred from federal habeas review.

## B. Merits Of The Ineffective Assistance Of Counsel Claim

Even if we were to find that Petitioner's ineffective assistance of counsel claim was not procedurally defaulted, Petitioner is still not entitled to relief on the merits of this claim. Title 28, United States Code, Section 2254(d) governs the consideration of any claim adjudicated by a state court on its merits. Under that statute, we may grant habeas relief only if the state court's adjudication of the claim "was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States." 28 U.S.C. §

2254(d)(1). Under subsection (d)(2), habeas relief is possible if the state court adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented" in the state court.

The Supreme Court, in Williams v. Taylor, 529 U.S. 362 (2000), attempted to clarify the applicable standard of review within the meaning of section 2254. The Court noted that the Act does not explicitly prescribe a recognizable standard of review for applying either of the statutory clauses. Id. at 385. Recognizing the need for further clarification and direction to lower courts, the Supreme Court concluded that the "[the Act] plainly sought to ensure a level of 'deference to the determinations of state courts,' as long as those decisions do not conflict with federal law or apply federal law in an unreasonable way." Id. at 376. Additionally, the Supreme Court determined that, in passing the statute, "Congress wished to curb delays, to prevent 'retrials' on federal habeas petitions and to give effect to state convictions to the extent possible under the law. When federal courts are able to fulfill these goals within the bounds of the law, [the statute] instructs them to do so." Id. Therefore, this Court is directed to apply a deferential review of the state court decision unless it is determined that the state court violated federal law.

Petitioner argues that he was denied the effective assistance of counsel. The standard for reviewing a claim of ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668 (1984). Strickland sets forth a two-prong analysis for determining ineffectiveness of counsel: 1) a showing that counsel's performance was deficient; and 2) a showing that the deficient performance prejudiced the Petitioner. Id. at 678. In order to prevail on his claim of ineffectiveness under the first prong of the Strickland test, Petitioner must show that his counsel's performance fell below an objective standard of reasonableness. Id. In reviewing the

challenged conduct, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. To satisfy the prejudice prong of the Strickland test, Petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different. Id. This Court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the Petitioner as a result of the alleged deficiencies." Id. Rather, "[i]f it is easier to dispose of an ineffective assistance of counsel claim based on the ground of lack of sufficient prejudice, which . . . will often be so, that course should be followed." Id.

In this case, Petitioner argues that trial counsel was ineffective because he failed to present at sentencing sufficient evidence of the mitigating nature of Petitioner's background, which was that, as a five year-old, Petitioner witnessed his mother kill his stepfather. Specifically, Petitioner argues that his attorney should have presented psychiatric expert evidence in support of mitigation. Failure to offer psychiatric evidence in mitigation does not in and of itself demonstrate deficient performance. To succeed on a claim that counsel is ineffective at sentencing, petitioner must show that counsel's performance was below minimal professional standards and that a reasonable probability exists that the sentence was affected. See, e.g., Roche v. Davis, 291 F.3d 473 (7th Cir. 2002); People v. Brisbon, 164 Ill.2d 236, 246, 647 N..E.2d 935 (1995).

At the sentencing hearing, Petitioner's trial counsel elicited the following testimony from Petitioner regarding his family background:

"Q: Reginald, can you tell us who your mother is and who your father is?
A: I don't know. I doesn't [sic] know who my father is. I know who my mother is. She is living on the west Side of the city.

23

Q: Did you always live with your mother?
A: No.
Q: When did you stop living with your mother?
A: When I was five years old.
Q: Why was that?
A: Because she was arrested for murder, for killing my brother's father.
Q: Was she tried for that?
A: Yes
Q: Were you taken away from her as a result of that?
A: Yes.
Q: Did you become a ward of the State?
A: Yes.
Q: At age five?
A: Yes.
Q: What happened to you after age five? Where did you live?
A: My brother and I were placed in the Department of Children and Family Services.
Q: Are these foster homes?
A: Yes. Foster homes, group homes.
Q: How many foster homes were you placed in during the–
A: Ten.
Q: From what age?
A: From five to sixteen."

Trial counsel presented further evidence in mitigation at sentencing and argued that Petitioner had no prior criminal record, the crime was not premeditated and Petitioner previously cooperated with the state in an unrelated case. In sentencing Petitioner, the trial judge explicitly stated that he considered the factors in mitigation and aggravation, including the fact that Petitioner had been forced to live in multiple foster homes. In affirming the convictions on direct appeal and in imposing concurrent rather than consecutive sentences, the Appellate Court commented on Petitioner's lack of criminal background, his age, his broken home and multiple foster home placements.

We find that trial counsel's decision not to present further evidence of the traumatic effect Petitioner's family background had upon him as a factor in mitigation does not amount to

ineffective assistance of counsel. First, we do not believe that counsel's performance "fell below an objective standard of reasonableness." See Strickland, 466 U.S. at 678. Trial counsel did present evidence regarding Petitioner's troubled childhood and did make the court fully aware of Petitioner's background. The record establishes that during the sentencing hearing, Petitioner testified that he witnessed his mother kill his stepfather at the age of five and that he lived in ten foster homes before he was sixteen years old. Additional evidence would have been cumulative. Thus, we find that trial counsel made the court fully aware of Petitioner's family background, and the court specifically took these factors into consideration at sentencing. The Appellate Court also specifically commented on Petitioner's family background in reducing his sentence.

Moreover, trial counsel's decision not to present expert evidence regarding Petitioner's background is a matter of trial strategy which should not be second guessed by this Court. As the Illinois Appellate Court noted on post-conviction review, the use of expert testimony to show the traumatic effect that Petitioner's family background had on his behavior might not be inherently mitigating. The trial judge might have considered expert evidence of Petitioner's troubled life as an indicator of Petitioner's future dangerousness and thus an aggravating factor. Thus, trial counsel may have felt that the risks in presenting potentially mitigating evidence was too high. See People v. Steidl, 142 Ill.2d 204, 249, 568 N.E.2d 837 (1991). As a result, we find that trial counsel's performance was reasonable under the circumstances.

Additionally, Petitioner cannot show prejudice as a result of trial counsel's alleged ineffectiveness. Given the amount of aggravating evidence, there is no reasonable probability that additional evidence regarding Petitioner's family background would have changed the sentence. The record shows that the trial judge was fully aware of the circumstances of

25

Petitioner's family background. In light of the overwhelming aggravating circumstances, it is not reasonable to believe that expert evidence regarding Petitioner's troubled background would have been sufficient to change the judge's sentencing decision. Thus, there is no evidence that Petitioner would have received a different punishment had trial counsel further elaborated on the impact that Petitioner's family background had on his behavior.

For these reasons, we find that even if this issue was not procedurally defaulted, trial counsel's decision not to present further evidence of the traumatic effect Petitioner's family background had upon him as a factor in mitigation does not support a finding that counsel was ineffective. Therefore, we find that trial counsel's performance satisfies the requirements of the Sixth Amendment, and Petitioner is not entitled to habeas relief on his claim of ineffective assistance of counsel.

## II. Due Process And Equal Protection

Petitioner next argues that his rights to due process and equal protection were denied when the post-conviction court declined to appoint a psychiatrist to assist Petitioner in presenting evidence in support of his post-conviction petition. Petitioner attacks the post-conviction court's failure to appoint a psychiatrist to assist Petitioner in presenting evidence in support of Petitioner's post-conviction position that trial counsel rendered ineffective assistance in failing to present psychiatric evidence at the sentencing hearing. Petitioner claims that "[a]t issue is the degree and scope of an indigent's constitutional due process right to have an expert appointed to assist the indigent in . . . presenting arguments and evidence in support of the indigent's constitutional claim in a post-conviction proceeding."

We find that Petitioner is not entitled to habeas relief on this claim for two reasons. First,

an error in collateral state proceedings cannot be the basis of habeas relief. Habeas corpus is available to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. §2254(a). "Errors or defects in the post-conviction proceeding do not, ipso facto, render a prisoner's detention unlawful or raise constitutional questions cognizable in habeas corpus proceedings . . . . Even where there may be some error in state post-conviction proceedings, this would not entitle appellant to federal habeas corpus relief since appellant's claim here represents an attack on a proceeding collateral to detention of appellant and not on the detention itself." Williams v. Missouri, 640 F.2d 140, 144 (8th Cir. 1981), cert. denied, 451 U.S. 990, 101 S. Ct. 2328 (1981); See also United States ex rel. Correa v. O'Leary, No. 87 C 4247, 1988 U.S. Dist. LEXIS 1108 (N.D. Ill. 1988).

In this case, Petitioner's claim is an attack on the state post-conviction proceedings because Petitioner attempts to attack the ruling of the circuit court on post-conviction review. In light of the above-mentioned standards, the failure of the post-conviction court to appoint a psychiatrist to determine whether a psychiatric expert evidence should have been presented at Petitioner's sentencing hearing is not cognizable on federal habeas review. It is an attack on a collateral proceeding.

Second, even if Petitioner had claimed that he was denied due process and equal protection at sentencing because he did not receive a court appointed psychiatrist (this issue would also be defaulted on federal habeas review), his claim would lack merit. Petitioner cites the case of Ake v. Oklahoma, 470 U.S. (1985) in support of his position. In Ake, the Supreme Court held that an indigent defendant has a constitutional right to have a psychiatrist appointed to conduct a sanity examination when the indigent defendant has shown that his sanity at the time

of the offense will be a significant factor. Id. at 83. Ake requires that a Petitioner's mental state becomes a threshold issue before a psychiatrist is appointed for an indigent Petitioner. Id.

In this case, we find that Petitioner's request for a psychiatric evaluation would not assist in demonstrating a crucial issue in the case. Although petitioner argues that he was entitled to a psychiatric examination, his mental state was not raised as a crucial issue at trial or at sentencing. Petitioner's theory at trial was self-defense. Because Petitioner's mental competency was not raised as a crucial issue at trial or at sentencing, he was not entitled to a court appointed psychiatrist. See Id.

For these reasons, we find that Petitioner is not entitled to habeas corpus relief on his claims of due process and equal protection violations.

## CONCLUSION

For the foregoing reasons, we deny the § 2254 petition for a writ of habeas corpus brought by Petitioner Reginald Perry. This is a final and appealable order. This case is terminated.

It is so ordered.

Wayne R. Andersen
United States District Judge

Dated: June 19, 2003